UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

MARTIN FRIEDMAN,
      Plaintiff,                  14-cv-130 (JGK)
      - against -
MARY KUCZKIR a/k/a FERN MICHAELS,
PAK6, INC., and KAP5, INC.,

           Defendants.
─────────────────────────────────

MARY KUCZKIR a/k/a FERN MICHAELS,
PAK6, INC., FIRST DRAFT, INC., and    14-cv-9060 (JGK)
MRK PRODUCTIONS, INC.,

      Plaintiffs,
      - against -
MCLAUGHLIN & STERN, LLP and
MARTIN FRIEDMAN,                  OPINION AND ORDER
           Defendants.
─────────────────────────────────

JOHN G. KOELTL, District Judge:

    This case is about the dissolution of a professional and
personal relationship between a lawyer and his former client.

    Martin Friedman began performing a variety of legal
services for Mary Kuczkir -- a successful author who writes
under the pen name Fern Michaels -- in the early 1980's.
Beginning in 2004 Friedman also began acting as Kuczkir's
literary agent, and in 2007 Friedman began receiving an 11%
commission pursuant to a Commission Agreement for each
publishing contract procured by Friedman on Kuczkir's behalf.
Friedman and his law firm, McLaughlin and Stern, continued to
bill Kuczkir by the hour for all work performed on her behalf,
including for the literary agency work. Over six years later,

1

the relationship deteriorated and Kuczkir fired Friedman.
Friedman now seeks payment of an 11% commission on the royalties
from a publishing contract that he claims to have procured
between Kuczkir and Kensington Publishing Corp. ("Kensington")
prior to his termination in 2013, as well as commission payments
from other past publishing contracts which are currently being
withheld. Friedman asserts eight state law claims against
Kuczkir and two of her corporate entities ("Action One"), chief
among them breach of contract and, in the alternative, breach of
the implied covenant of good faith and fair dealing and quasi-
contractual claims.

Kuczkir argues that Friedman is not entitled to any
commission on the contract with Kensington -- a version of which
was ultimately signed in March of 2014 -- and also maintains in
a counterclaim in Action One that Friedman breached his
fiduciary duty to her, that the Commission Agreement is thus
unenforceable, and that all past commissions received should be
returned. Kuczkir and the various corporate entities through
which she contracts, including PAK6, Inc., KAP5, Inc., First
Draft, Inc., and MRK Productions, Inc. (together, the "Kuczkir
Parties"), also sued Friedman and his former law firm --
McLaughlin and Stern -- alleging malpractice and seeking
disgorgement of all past fees paid by the Kuczkir Parties
("Action Two").

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship.

The Court conducted a non-jury trial in this case from January 9, 2017 through January 18, 2017. Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### I. BACKGROUND

1. Martin Friedman is an attorney and former partner at the law firm McLaughlin and Stern ("M&S"). Transcript ("Tr.") 54. Friedman is licensed to practice law in the state of New York. Tr. 42.

2. Mary Kuczkir is an 84 year-old author who writes under the pen name Fern Michaels. Kuczkir grew up poor and did not attend college or receive any education in business, but has achieved significant success as a prolific fiction author. Tr. 288, 586. Kuczkir has dyslexia, but since the early 1970's she has been responsible for approximately 165 novels, nearly all of which have ended up on a bestseller list. Tr. 585–86.

3. Rather than entering into agreements with publishers herself, Kuczkir writes books pursuant to publication agreements

whereby one of her various corporate entities contracts with the publisher directly. Tr. 395-96.

4. Friedman and M&S began representing Kuczkir, her family, and her various corporate entities in the early 1980's, performing a variety of services including general corporate work, intellectual property work related to Kuczkir's writing and publishing career, and trusts and estates work. Tr. 42.

5. Prior to 2004, Kuczkir used the services of at least five literary agents in connection with her writing career. Tr. 42. Those agents would generally read Kuczkir's manuscripts and send them to publishers; attend book fairs and trade shows; negotiate foreign rights; assist with marketing; set up book signings; and assist in the selection of book covers and book jacket designs. Tr. 588-89.

6. A literary agent has a fiduciary duty to the agent's client and is required to act in the best interests of the client. Tr. 967.

7. The industry standard commission for literary agents is and was 15%. Tr. 43. Agents are paid for all work procured by them during their tenure as literary agents, regardless of the amount of work performed. Tr. 830. When a literary agent is terminated, the agent continues to be paid a commission on any royalties received from deals negotiated by that agent. Tr. 56-57.

8. All of Kuczkir's literary agents prior to 2004 were paid a
   15% commission on all advances and royalties generated as a
   result of their procurement of contracts on Kuczkir's behalf
   with various publishing houses, including Kensington, her
   primary publisher since the mid-1990's. Tr. 42-43. Kuczkir
   continued to pay each of her prior literary agents
   commissions for all deals they had procured on her behalf
   even after the end of the agency relationship. Tr. 56-57.

9. Kuczkir's literary agent immediately prior to Friedman was
   Robert Gottlieb. M&S represented Kuczkir in the negotiation
   of the literary agency agreement between Kuczkir and
   Gottlieb. Tr. 292, 416.

## II. THE LITERARY AGENCY RELATIONSHIP

10. Sometime in 2004, Kuczkir indicated to Friedman that she was
    "not fond" of her then-agent Gottlieb. In response, Friedman
    told Kuczkir that Gottlieb's primary function was to
    negotiate contracts, and that Friedman could do that for her.
    Friedman suggested to Kuczkir that she fire Gottlieb and have
    Friedman himself act as her literary agent. Tr. 418-19, 590.

11. In late 2004 Kuczkir fired Gottlieb and Friedman began acting
    as her sole literary agent. Tr. 590. Although Friedman
    acknowledged that the agency relationship constituted a
    "business relationship" with Kuczkir, neither Friedman nor
    anyone at M&S advised Kuczkir to seek independent legal

advice regarding the agency relationship. Tr. 254. In May 2005, Kuczkir gave formal notice to her publishers, including Kensington, that Friedman was her literary agent. Tr. 110; Ex. 33. As a result, the standard Kensington publishing agreement with the Kuczkir Parties was amended to reflect that Friedman was Kuczkir's literary agent and that monies payable to Kuczkir should be sent initially to him at M&S. Tr. 110.

12. Between 2004 and 2007, the Kuczkir Parties were billed $325/hour for all work performed by attorneys at M&S, including for the literary agency work performed by Friedman. Tr. 42.

13. Over the same three-year period, Friedman continued to perform as Kuczkir's literary agent. Among other work that he performed, Friedman sought to secure film and television rights on behalf of the Kuczkir Parties. See Exs. D, E. In connection with those negotiations, Friedman also sought payments and producer credits for himself in order to establish name recognition in anticipation of a potential career in Hollywood. Tr. 318-19.

14. Steven Zacharius, the CEO and President of Kensington beginning in 2005 and one of Kuczkir's close friends, observed based on his dealings with Friedman that Friedman's work as a literary agent was limited compared to the tasks

undertaken by other agents. Tr. 791, 793-94. Zacharius observed that Friedman's work as an agent was mostly confined to negotiating the terms of Kuczkir's publishing contracts, including the financial terms, the number of books, and the amount that Kuczkir would be paid per book. Tr. 793-94. Zacharius noted that Friedman did not, for example, assist with book cover selection for Kuczkir's books. Tr. 794.

15. In late 2005, one of Kuczkir's daughters died unexpectedly. Tr. 423.

### III. THE COMMISSION AGREEMENT

16. Eventually, in early 2007, Friedman developed a desire to obtain a literary agency commission in addition to the legal fees that he was charging through M&S. Friedman believed he had been working as Kuczkir's literary agent for a below-market rate and that, after three years of experience, he deserved to receive a commission just as Kuczkir's prior literary agents had. Tr. 114-15. Friedman considered this arrangement -- whereby he would continue to perform the same work he had been performing, but be paid vastly more for it -- to be "the American dream." Tr. 264.

17. Thus, sometime in early 2007, Friedman broached the topic of receiving a commission for his literary agency work on a phone call with Kuczkir. During the call, which lasted a few minutes, Friedman requested the industry standard 15%

commission. Tr. 116-17. Kuczkir countered with an offer of 10%, and the two eventually agreed on an 11% commission on all advances and royalties on all deals negotiated and secured by Friedman on Kuczkir's behalf (the "Commission Agreement"). Tr. 117. Friedman testified that he communicated to Kuczkir on that call that hourly billing through M&S "would continue as it had before at the same rate" in order for M&S not to be harmed by the arrangement. Tr. 259. However, Friedman's testimony that he specified on that call that the hourly rate would continue to be charged for precisely the same work that would also be subject to the Commission Agreement was not credible. Tr. 259-60. Kuczkir, for her part, testified that she refused to pay a 15% commission and demanded a lower one because Friedman "had absolutely no experience as a literary agent" -- although by that time he had been acting as her literary agent for about three years -- and had no other clients, no industry contacts, and no staff to assist him. Tr. 443-44.

18. Following the phone call between Friedman and Kuczkir, in March 2007 Friedman sent Kuczkir a written agreement (the "2007 Written Agreement" or "Written Agreement") memorializing the 11% commission arrangement. Tr. 43, 123-26; Ex. 11. The Written Agreement specified that Friedman would be paid an 11% commission "relating to a proposed contract

with Kensington" for a specified set of twelve books. Ex. 11.
There were actually two contracts -- one contract for ten
books and a separate contract for another two books. Tr. 267-
70. The Agreement was written on Friedman's personal
letterhead, and did not specify that M&S would continue to
bill Kuczkir $325/hour for all work performed, including
Friedman's literary agency work. Ex. 11. Friedman testified
that he did not include any reference to the continued hourly
billing because he felt it "had nothing to do with" the
Written Agreement. Tr. 126. Kuczkir testified that it was her
understanding that "there would be no hourly rate" charged
for the literary agency work going forward but that testimony
was not credible. Tr. 450. There is no credible evidence that
Friedman and Kuczkir discussed continued billing by M&S for
Friedman's literary agency work at the time they entered into
the Commission Agreement, and that issue was not included in
the Written Agreement. It was an issue that was simply not
addressed.

19. The Written Agreement was modeled after -- but was not
identical to -- the literary agency agreement Kuczkir had
entered into with her prior agent, which had been negotiated
through counsel. Tr. 124; Ex. 11.

20. Neither Friedman nor anyone at M&S advised Kuczkir to seek
the advice of counsel before entering into the Commission

Agreement or signing the Written Agreement, which Friedman

agrees was a business relationship with a client. Tr. 127,

262. Friedman also admits that he was unaware at the time of

the existence of Disciplinary Rule 5-104, which governed

business transactions between lawyers and their clients in

2007. Tr. 271, 273.[1]

21. Throughout the course of Friedman's representation of the

Kuczkir Parties, Kuczkir was personally involved in several

substantial litigations in which she was represented by firms

other than M&S. Tr. 56. She had access to multiple other

attorneys besides Friedman and M&S, and consulted them

frequently. Tr. 46, 56.

22. Kuczkir did not consult an attorney before signing the

Written Agreement. Tr. 262. However, she testified that she

discussed the 2007 Written Agreement and the Commission

Agreement more generally with the then-owner of Kensington,

Walter Zacharius, who told her that it was okay to sign the

Agreement. Tr. 439. Kuczkir signed the Written Agreement and

sent it back to Friedman. Ex. 11.

---

[1] The Code of Professional Responsibility, including the
Disciplinary Rules, was repealed, effective April 1, 2009, and
replaced by the New York Rules of Professional Conduct. DR 5-104
has been replaced by Rule 1.8, which carries forward
substantially the same provisions.

23. As a result, when the two pending contracts with Kensington were signed in April 2007, Friedman received an 11% commission on those contracts, including an immediate advance of at least $110,000. Tr. 268, 284, 287; Ex. FF.

24. At trial, Kuczkir testified that at the time she signed the Written Agreement –– nearly a year and a half after the death of her daughter –– she was grieving and "wasn't in a good place" and was planning to quit writing. Tr. 439-40. She testified further that she "couldn't have cared less" about the pending book contracts with Kensington, under which she stood to make more than $4 million in advances. Tr. 440-41, 806; Ex. FF. Kuczkir had not testified at her deposition or in any affidavit submitted during the course of this litigation that she was grieving and was planning to quit writing at the time the Written Agreement was signed. Kuczkir's trial testimony to that effect was not credible.

#### IV. PERFORMANCE UNDER THE COMMISSION AGREEMENT

25. The credible evidence establishes that Kuczkir understood and agreed that she would be paying Friedman an 11% commission. Tr. 43; Exs. 11, 92 ¶¶ 8-9. Although the Written Agreement referred to a specific set of twelve books, the parties agreed and continued to abide by the Commission Agreement for all contracts procured by Friedman on behalf of the Kuczkir

Parties between March 2007 and his termination in the fall of 2013. Tr. 43.

26. Thus, for the 6 and ½ years between March 2007 and Friedman's termination on October 1, 2013, Friedman continued performing the same literary agency work he had been performing prior to the Commission Agreement, and Kuczkir continued paying Friedman an 11% commission on all advances and royalties on all deals that Friedman negotiated and secured on her behalf. Tr. 43, 57.

27. Throughout that time, Kuczkir retained complete authority to accept or reject any offer that was presented to her. Tr. 55. She also understood that she could fire Friedman as her literary agent and as her attorney at any time. Tr. 56, 134.

28. Once a publishing agreement was entered into, Kuczkir was always aware of when money was due to be paid to her. Tr. 70, 722-23. Once payments were made by the publisher, those funds were deposited into the PAK6 Signature Bank account, which had been set up by Friedman. Tr. 112-13. Friedman would then cut a check to Kuczkir for 89% of the amount deposited, and a check to himself for the remaining 11%. Tr. 111-12. M&S never received any portion of the commission payments. Tr. 462.

29. The Kuczkir Parties' "de facto CFO" and accountant Michael Bernstein received copies of all monthly bank statements from the PAK6 Signature Bank account, and Kuczkir spoke frequently

with Bernstein about her finances. Tr. 112, 141. PAK6, through Bernstein, issued annual IRS Form 1099s to Friedman and took a tax deduction for all commissions paid to him as the Kuczkir Parties' literary agent. Tr. 58. Kuczkir reviewed the annual tax returns prepared by Bernstein. Tr. 59. Bernstein testified that Friedman and Kuczkir were "on the same page" about Friedman's getting "an 11 percent commission agreement," and the credible evidence supports that testimony. Tr. 723.

30. Throughout the same time period -- between 2007, when the Commission Agreement was entered into, and October 2013, when Friedman was terminated -- Friedman continued to bill the Kuczkir Parties at an hourly rate of $325/hour for all work performed, including his literary agency work that was also subject to the 11% commission. Tr. 43, 84. Friedman's normal average billing rate in 2007, by comparison, was approximately $480/hour. Tr. 55. M&S was aware that Friedman was receiving a commission for his literary agency work in addition to billing hourly for time spent on that work, although Friedman had not discussed the Commission Agreement with the firm before entering into it. Tr. 128-30. Beginning in 2008, M&S reported Friedman's agency relationship with the Kuczkir Parties to the firm's insurance carrier. Tr. 788-89.

31. Every month Kuczkir received a billing invoice from M&S for work performed during the previous month. See Ex. 93. The first page of those invoices included a summary paragraph detailing the types of services rendered that month. Ex. 93. Kuczkir received and reviewed the M&S invoice every month, read the summary description on each bill, and personally paid the invoice by check each month. Tr. 43-44. The literary agency services performed by Friedman were not distinct from the legal work performed, and the monthly invoices did not categorize or otherwise specify which work performed was legal and which was non-legal in nature. Tr. 877-80.

32. It was nevertheless plain from the face of the monthly invoices that literary agency work performed by Friedman continued to be billed hourly by M&S after Friedman and Kuczkir entered into the Commission Agreement. The summary paragraph in the monthly invoices nearly always included express references to Friedman's work as a literary agent, including references to negotiations with Kensington and other book publishers. For example, the summary paragraph in the May 9, 2007 invoice lists tasks including "review emails re: Simon and Schuster's proposal and telephone conferences with Mary Kuczkir re: same," and the June 13, 2007 invoice includes "telephone conferences with [Kensington employees]

re: publication schedules; review novella contract; memo to [Kensington employee] re: comments." Ex. 93.

33. Barbara Bennett -- the General Counsel at Kensington who was also retained by the Kuczkir Parties as an expert witness in this case -- testified that it was clear from the summary descriptions on the invoices that the M&S bills included literary agency work. Tr. 945-46.

34. Kuczkir continued to receive, review, and pay the monthly M&S invoices after entering into the Commission Agreement and did not notice any decrease in the amounts charged before and after the Agreement. Tr. 593-94. Indeed, the amount charged by M&S on a monthly basis remained essentially static from 2007 through 2013. Ex. 93; Tr. 593-94. Friedman testified credibly that Kuczkir never asked why the hourly billing for literary agency work had not stopped. Tr. 122. Kuczkir's testimony at trial -- that she eventually questioned Friedman about the continued hourly billing for agency work and that she "just took his word for everything" and accepted his response that "[h]e was doing this and he was doing that" and then never brought it up again -- was not credible. Tr. 594. Kuczkir's testimony that she never noticed that the amounts charged had remained static after entering into the Commission Agreement in March 2007 because she "wasn't in the

land of the living" due to the death of her daughter in late
2005 was likewise not credible. Tr. 593-94.

35. Kuczkir testified at trial that the first time she
"discovered" that the literary agency work had continued to
be billed hourly was when her daughter "pointed it out" to
her in 2013. Tr. 595. But the invoices reviewed by Kuczkir's
daughter -- from which her daughter gleaned that the literary
agency work had been billed by the hour -- were precisely the
same invoices that Kuczkir had been receiving, reviewing, and
paying for more than six years after the entry of the
Commission Agreement. Tr. 59-60, 595. Kuczkir also told
Bernstein in a December 9, 2013 email that she herself had
been the one to "discover" the continued hourly billing and
that she had done so "by looking at the bills." Ex. 83.

36. The credible evidence therefore establishes that for over six
years after she entered the Commission Agreement with
Friedman, Kuczkir knowingly paid $325/hour for literary
agency work performed by Friedman in addition to knowingly
paying the 11% commission under the Commission Agreement.

37. All told, between 2007 and 2013 Friedman received over $1.5
million in commissions on contracts that generated over $12
million for the Kuczkir Parties. Kuczkir Parties' Resp. to
Friedman and M&S's 56.1 Stmt. ¶¶ 34-36.

## V. THE NEW CONTRACT

38. Friedman left M&S effective August 6, 2013 but continued to represent the Kuczkir Parties. Tr. 54, 60, 748. With Kuczkir's authorization, most of the Kuczkir Parties' files were sent to Friedman. Tr. 60, 748.

39. Sometime in 2013, Kuczkir received an offer for a three-book deal from Harlequin, another publishing house. Tr. 497. Friedman used that offer as leverage to secure a new publishing deal with Kensington, Kuczkir's primary publisher. During the summer of 2013, Friedman had been in the midst of negotiating that new contract with Kensington. Tr. 45; Ex. 87. By August 9, 2013, the parties had come to an agreement on several essential terms of the deal: Kensington would publish "three mass market paperback original books" in the "Sisterhood" series and "two stand-alone" novels, defined as "CONTEMPORARY NOVELS #49, #50, #51, #52 and #53." Ex. 12. The parties agreed to the total amount of the advance payment, $3.2 million, payable in installments, and agreed that Kuczkir would be paid about one-third of the advance within thirty days of signing the agreement. Tr. 60; Ex. 12. That agreement constituted the first time that Kensington had offered Kuczkir such a large proportion of the total amount of the contract as an upfront payment. Tr. 60-61.

40. These details, and others, were commemorated in a "Letter Agreement" dated August 9, 2013, prepared and signed by Barbara Bennett at Kensington and countersigned by Kuczkir's son on behalf of PAK6. Ex. 12. It was not Kensington's normal practice to send out such a memorandum. Tr. 799. Kensington prepared the Letter Agreement at the direction of its President, Steven Zacharius, who testified that Friedman had indicated to him that Kuczkir was eager to "get a new contract done immediately." Tr. 798. Thus, in order to preserve the basic terms of the agreement, Bennett drafted the Letter Agreement. Tr. 798-99, 824; Ex. 59.

41. The Letter Agreement did not include many of the essential terms of a publishing contract, including delivery and publishing schedules, reversion and options periods, and other boilerplate legal provisions generally contained in Kensington's publishing contracts. Tr. 617, 800; Ex. 12. Delivery dates are essential to a publishing contract because they, for example, inform the author how much time the author has to write the books at issue, and dictate scheduling, planning, artwork, marketing, and other related decisions. Tr. 616, 801. Reversion periods are also essential because those dates dictate the period of time in which the publisher can guarantee that the author will not publish another book

in a certain genre or category with another publisher. Tr. 800-02.

42. Kensington would not have paid Kuczkir or published any books based solely on the Letter Agreement. Tr. 804; Ex. 12.

43. Kuczkir was elated at the financial terms of the deal -- in particular, the offer to pay a one-third advance upfront. In an August 5, 2013 email to her accountant Michael Bernstein, Kuczkir stated: "[Friedman] somehow managed to get one third of the total contract up front which will be $1,216,667 . . . I am positively giddy. Who knew????" Ex. 40.

44. At trial, Kuczkir testified that she did not want to agree to the Letter Agreement and was actually thinking of quitting writing. Tr. 615. She testified that she was concerned about entering another book deal in light of the existence of another contract that she had already entered into which obligated her to write several other e-books and novellas. Tr. 616-17; Ex. P. Kuczkir testified that she told Friedman that she did not want to enter into another book deal at that time, but that Friedman pressured her to have her son sign the Letter Agreement on her behalf by assuring her that the Agreement was not binding and was meant simply to keep the offer on the table. Tr. 498, 617. She further testified at trial that "Marty [Friedman] is the one that wanted the upfront money," that he always wanted "more, more, more," and

that Friedman did not care that Kuczkir would have to work "24/7" to fulfill her obligations under the publishing contract. Tr. 614, 617. Kuczkir insisted at trial that she did not care at all about the advance and that, indeed, she preferred not to receive so much of the total value of a contract upfront. Tr. 614. That testimony was not credible and is not supported by the contemporaneous documents, which establish that Kuczkir was not only ready and willing to enter a new agreement to produce and publish more books, but also was "giddy" at the terms laid out in the Letter Agreement -- especially the size of the upfront advance. Ex. 40. Moreover, Kuczkir's testimony was inconsistent with the fact that she subsequently entered into an agreement to produce the very same books for the same amounts of money.

45. Later in August 2013, Kuczkir was in a car accident in which nobody was hurt but during which she claimed that her "life flashe[d]" before her. Tr. 498. As a result, she decided to "put [her] house in order." Tr. 498. As part of that process, Kuczkir reviewed the terms of a trust that had been prepared by M&S nearly a decade earlier and found that it was not what she wanted. Tr. 498; Ex. 51. Kuczkir communicated her displeasure to Friedman by email on August 15, and Friedman responded assuring Kuczkir that he would work with another attorney to ensure the issue was resolved to her

satisfaction. Ex. 51. On August 19, Kuczkir told Friedman
that they would "discuss the Trust when [she] ha[d] a very
clear head on it. Until then, it's business as usual." Ex.
52. Kuczkir went on to explain that "[w]e have two different
issues here. The Trust and my work. One has nothing to do
with the other." Ex. 52.

46. Friedman therefore continued to negotiate the terms of a new
publishing agreement between Kensington and Kuczkir. On
September 12, 2013, Barbara Bennett emailed Friedman stating:
"I have the new contract ready." Ex. 46. That agreement,
which was marked "#13-09-251A (AL)," ("the New Contract") --
"AL" being a reference to Kuczkir's editor at Kensington,
Audrey LaFehr -- was a full-length standard Kensington
publishing agreement that included the same books and the
same payout terms as the Letter Agreement. Tr. 66; Ex. 28. It
included dates for manuscript delivery and publication,
provisions for reversion and options rights, and other
standard legal provisions. However, the reversion and options
dates were left "TBD." Ex. 28. The parties made another
series of small changes and Barbara Bennett sent Friedman an
updated version of the New Contract by email on September 26,
2013, stating: "I'm assuming you had no other issues with the
agreement and that we should be in very good shape here." Ex.
85.

47. On September 30, 2013, Kuczkir contacted Friedman and stated
    that she "ha[d] been going over [her] finances" and that she
    believed she had been mistakenly billed twice in August for
    work that had been performed by an associate at M&S. Ex. T.
    Kuczkir asked for a "detailed breakdown" of her legal bills.
    Ex. T. Friedman followed up the same day acknowledging that a
    mistake had been made. Ex. U. Kuczkir did not say anything at
    that time about being billed hourly by M&S for the literary
    agency work performed by Friedman. Ex. T.

## VI. TERMINATION

48. Kuczkir terminated Friedman by email the very next day,
    October 1, 2013. Ex. 54. In response, Friedman stated that he
    had "spent considerable time and energy negotiating what we
    both know is a great deal with Kensington" and that he
    "expect[ed] to be paid for any contract that [Kuczkir]
    enter[ed] into with Kensington for print books." Ex. 54.
    Friedman added: "Considering the amount of money involved, I
    am prepared to go the distance with [a] [law]suit if
    necessary, but I would hope to settle any dispute now rather
    than later." Ex. 54. Kuczkir immediately forwarded the email
    to Steven Zacharius with the note: "Can he do this? What
    should we do?" Ex. 54.

49. The same day, Kuczkir notified Zacharius in a separate email
    that she had terminated Friedman and instructed that "his 11%

of any advances or royalties that he handled are to be paid directly to him." Ex. 58.

50. Shortly thereafter, Kuczkir began inquiring into the effects of the Letter Agreement, the status of the New Contract, and the implications of terminating Friedman. On October 2, Barbara Bennett emailed Kuczkir attaching the signed Letter Agreement. Bennett stated: "You might recall that we prepared this document in advance of actual contracts because the publication schedule for the new books had not been determined." Ex. 55. Kuczkir responded that she had not signed it but that her son did and then asked: "Now, what does that mean?" Ex. 55.

51. That same day, Zacharius emailed Kuczkir about the Letter Agreement, informing her that he did not know whether Friedman would be entitled to a commission under the Letter Agreement but that was something Kuczkir should talk about with her own lawyer. Ex. 56. He continued: "In the meantime with the new contract; we're going to have to be told how to proceed in terms of splitting or possibly withholding his potential commission on the signing payments. . . . Of course as I've kept saying, we don't have a signed contract yet, so you have no reason to rush . . . although we do want to get the contract completed and I assume you want your signing payment." Ex. 56.

52. Two days later, Zacharius followed up with Kuczkir requesting "guidance on how to proceed with the new contract that had already had the terms agreed to with Marty [Friedman] and I believe your son, on behalf of PAK6." Ex. 57. Zacharius told Kuczkir that Friedman was likely to sue and that "the easiest option at this point" would be to offer Friedman a reduced commission on the New Contract. Zacharius further advised Kuczkir to speak to a lawyer. Ex. 57.

53. Around the same time as those communications between Kuczkir, Bennett, and Zacharius, Kuczkir wrote Friedman a letter that stated, among other things, that she felt she had "lost [her] best friend," that she had never been "trying to cheat [Friedman] or deny [him] fees," and that "the contract never entered [her] mind at the time" that she terminated him. Ex. 32; Tr. 524. She went on to explain: "I took great offense that you wanted to rush and jam this at me at a time when I was trying to figure out what went awry with the Trust. . . . All you had to do was give me time to make sense of the mess and it was a mess, and we could have cleared it all up. A mess YOU created with the Trust." Ex. 32. Again, Kuczkir said nothing about being billed hourly for literary agency work performed by Friedman.

54. The credible evidence in this case therefore does not support Kuczkir's testimony at trial that she terminated Friedman on

October 1 because she had discovered for the first time,
based on her daughter's review of the monthly billing
invoices, that she was being charged hourly by M&S for the
literary agency services rendered by Friedman. Tr. 491, 595,
611. Rather, the contemporaneous documentation shows that the
first time Kuczkir complained of having paid an hourly rate
for the literary agency services was in December 2013. Exs.
35, 68, 83. At that time, Kuczkir told Bernstein that "I have
all [Friedman's] bills for the year 2013 where he billed me
hourly for things an agent does as his duties as an agent. So
in truth, he did double dip me. The truth of the matter is
after we did a contract, []he just sat back and collected 11%
for doing absolutely nothing." Ex. 35. A few days later,
Kuczkir contacted Bernstein again, stating that "I figured it
all out myself by looking at the bills." Ex. 83. Bernstein
initially testified at trial that Kuczkir had notified him in
an email prior to Friedman's termination on October 1 that
Friedman had been "double dipping" her by charging by the
hour for the agency work. Tr. 715. However, when presented
with the December 16 email, Bernstein testified that he
believed that email was in fact the first time that Kuczkir
had relayed her complaint of "double dipping." Tr. 716-17.

55. In mid-October, Kuczkir followed up again with Barbara
Bennett to ask what significance the Letter Agreement had

"toward the pending contract that has not been signed." Ex. 37. Kuczkir told Bennett that she planned to dissolve PAK6 but would be willing to "negotiate a new contract on my own under a new corporation." Ex. 37. Bennett responded that she could not advise Kuczkir of the legal significance of the Letter Agreement and that Kuczkir should consult her own counsel. Ex. 59. In a separate exchange, Steven Zacharius communicated to Kuczkir that both he and Barbara Bennett had spoken to "outside counsel" and believed that "it would make more sense" to settle with Friedman than to engage in protracted litigation. Ex. 61.

56. Kuczkir continued to seek out ways to have the New Contract canceled. In November, Kuczkir contacted Bernstein asking him "what is the shelf life or expiration on a memo of intent that has Marty[] [Friedman's] knickers in a knot? Do you know? Could it be 90 days?" Ex. 69. The same day, Kuczkir suggested to Barbara Bennett that Kensington could "cancel" the New Contract or allow it to "expire" so that they could enter a new contract with Kuczkir representing herself without an agent. Ex. 63. Bennett assured her that Kensington had "no intention of canceling the [L]etter [A]greement." Ex. 63. At trial, when asked whether, at this point in time, Kuczkir was "intending to enter into the same agreement later on," she answered, "[p]ossibly." Tr. 572.

57. On December 17, 2013, Kuczkir emailed one of her lawyers the following request: "Can you please form me a new corporation ASAP. I have a contract pending with Kensington that is ready to go and we do not want to attach it to [PAK6]. . . . New name is KAP 5." Ex. 68.

58. The credible evidence therefore establishes that Kuczkir terminated the Commission Agreement with Friedman with the express purpose of avoiding any obligation to pay Friedman the 11% commission for the New Contract.

## VII. THE NEW CONTRACT, REVIVED

59. In January 2014 a new corporate entity, KAP5, was created and substituted for PAK6 as the contracting party to the New Contract. Ex. 68; Tr. 67.

60. In March 2014, Kuczkir and the newly-formed corporation KAP5 entered into a contract with Kensington for the same five-book deal that was memorialized in the Letter Agreement and set out in the New Contract. Exs. 12, 28, 29. The contract (the "KAP5 Contract") was marked "#13-09-251B (AL)," that is, with the exact same identifier used for the New Contract except that the KAP5 Contract was marked "B" instead of "A." Exs. 28, 29. The KAP5 Contract covers the exact same set of books and includes the exact same payment amounts, payout terms, and various dates as the New Contract. The only substantive differences between the New Contract and the KAP5

27

Contract are that (1) KAP5 was substituted for PAK6 as the contracting entity; (2) manuscript deadlines for two of the five books were changed in the KAP5 Contract to account for, in one case, the fact that the KAP5 Contract was not signed until months after the New Contract was initially drafted; and (3) the dates for exclusivity and options periods, which had previously been marked "TBD," were filled in. Exs. 28, 29.[2] Kuczkir continues to perform under that contract. Tr. 226; Ex. 8.

61. Although the KAP5 Contract was not signed until March 26, 2014, the first manuscript due under that contract was to be submitted by March 1, and Kuczkir was to be paid $200,000 thirty days later, just a few days after the contract was signed. Ex. 29. Kuczkir testified at trial that she may well have been performing under the KAP5 Contract —— that is, she may have already been working on the books set forth in that contract, which were identical to the ones set forth in the New Contract —— before she signed it. Tr. 582. The credible evidence therefore establishes not only that the contract that was signed was identical in all material respects to the New Contract negotiated by Friedman, but also that Kuczkir was either prepared to perform or had in fact already begun

_____

[2] The KAP5 Contract also directed an 11% commission to be held in escrow pending the outcome of this case.

performing under the terms of the deal negotiated by Friedman before signing the KAP5 Contract.

62. Kuczkir has expressed satisfaction that the duration of this case has caused Friedman to "spend his retirement funds to defend this" while she "keep[s] getting richer." Ex. 79. She has also expressed glee at the emotional toll that the case has taken on Friedman. See Ex. 79.

## VIII. PAYMENTS MADE AND RECEIVED

63. In January 2014, Kuczkir instructed Kensington to stop paying any commissions owed to Friedman and to hold those funds in escrow. Tr. 64. All commissions owed to Friedman under any past contracts and under the KAP5 Contract are therefore being held by Kensington pending the resolution of this case. Tr. 64. Those commissions total over $700,000 and include payments from October 3, 2013 through the present. Ex. 8; Tr. 217.

64. In total, between March 29, 2007 and October 1, 2013, the Kuczkir Parties paid $390,000 in hourly fees to Friedman and M&S. Tr. 70. Of that total amount, approximately half -- $195,000 -- related to Friedman's work as Kuczkir's literary agent, and the other half was for legal work unrelated to the agency work. Tr. 70.

65. Over that same time period, Friedman received just over $1.5 million in commission payments on contracts procured on the

Kuczkir Parties' behalf. The Kuczkir Parties received over
$12,200,000 under those same contracts. Kuczkir Parties'
Resp. to 56.1 Stmt. ¶¶ 34-36.

## CONCLUSIONS OF LAW

1.  To the extent that any of the foregoing findings of fact is a
    conclusion of law, it is hereby adopted as a conclusion of
    law.

2.  The Court has jurisdiction over this case pursuant to 28
    U.S.C. § 1332 based on complete diversity of citizenship.

3.  The parties agree that New York law applies.

### I. THE KUCZKIR PARTIES BREACHED THE COMMISSION AGREEMENT

4.  In order to recover from the Kuczkir Parties for breach of
    contract, Friedman must prove by a preponderance of the
    evidence (1) the existence of a contract between himself and
    the Kuczkir Parties; (2) that Friedman performed his
    obligations under the contract; (3) that the Kuczkir Parties
    breached the contract; and (4) that Friedman incurred damages
    as a result of that breach. Diesel Props. S.r.l. v. Greystone
    Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

5.  The existence of an enforceable contract was established by
    credible evidence that there was "an offer, acceptance,
    consideration, mutual assent and intent to be bound" by the
    Commission Agreement. Register.com, Inc. v. Verio, Inc., 356
    F.3d 393, 427 (2d Cir. 2004) (quotation marks omitted). In

March 2007 Friedman and Kuczkir agreed that Friedman would be paid personally 11% of all advances and royalties derived from all contracts negotiated and procured by Friedman as Kuczkir's literary agent. Ex. 11. Although the Written Agreement was initially limited to twelve books, the parties agreed that the Commission Agreement would extend to further book contracts negotiated by Friedman for Kuczkir, and the parties abided by the terms of that Commission Agreement until Friedman was terminated. Tr. 43, 57.

6. Friedman performed his obligations under the Commission Agreement from March 2007 through the date of his termination on October 1, 2013, acting as Kuczkir's literary agent and negotiating and procuring contracts on her behalf.

7. Kuczkir breached the Commission Agreement by failing to pay Friedman a commission for all contracts negotiated and procured on behalf of the Kuczkir Parties prior to his termination on October 1, 2013. Friedman is therefore entitled to "all the direct and proximate damages which result[ed]" from that breach. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (quotation marks omitted). Those damages consist of the entire amount of the funds being held in escrow totaling over $700,000, which represent the commissions for all contracts procured by Friedman as the Kuczkir Parties' literary agent,

including commissions on the KAP5 Contract, that have been improperly withheld after Friedman's termination. Ex. 8; Tr. 217.

8. Friedman is entitled to an 11% commission on the KAP5 Contract despite the fact that he was terminated prior to its execution because he was the procuring cause of that contract. See Berman & Brickell, Inc. v. Penn Cent. Corp., 1986 WL 9689, at *1 (S.D.N.Y. Aug. 26, 1986) (noting that "the broker must be the procuring cause of the contract between his principal and a third party to be entitled to compensation either under a specific agreement or in *quantum meruit*" (quotation marks omitted)). Although Friedman had been fired by the time the KAP5 Contract was signed and therefore took "no part in the arrangement of its final details," including some of the manuscript submission dates and the options and exclusivity dates, the credible evidence clearly demonstrates that the KAP5 Contract proximately resulted from Friedman's efforts. Id. at *2 (quotation marks omitted). Kuczkir herself admits that it was Friedman who used a competing proposal from Harlequin as leverage to obtain the basic agreement from Kensington. Tr. 45. That agreement -- to publish Kuczkir's Contemporary Novels #49, 50, 51, 52, and 53 for a total advance payment of $3,200,000, including over $1 million as an upfront advance -- was

precisely the agreement that Kuczkir ultimately entered into by signing the KAP5 Contract. Ex. 29. Kuczkir also acknowledged that it was Friedman who was responsible for negotiating the one third advance, remarking that "[Friedman] somehow managed to get one third of the total contract up front which will be $1,216,667." Ex. 40. And the KAP5 Contract is nearly identical -- down to its precise language -- to the New Contract negotiated by Friedman prior to his termination. Exs. 28, 29. Thus, the fact that Friedman had been terminated by the time the KAP5 Contract was actually signed is irrelevant because it is plain that Friedman was the "procuring cause" of that contract. Berman & Brickell, 1986 WL 9689, at *1; see also Manhattan Fuel Co. v. New England Petroleum Corp., 439 F. Supp. 959, 970 (S.D.N.Y. 1977) (broker was entitled to commission where broker was not involved in the final stages of the negotiation, but brought contracting parties together, supplied relevant quotations and other information, and arranged and attended meetings to facilitate agreement on terms of the deal, and where final contract contained several provisions negotiated by the broker).[3] That conclusion is bolstered by credible evidence

_____

[3] The Kuczkir Parties' argument that "the procuring cause doctrine is inapplicable to literary agency relationships" is unsupported. Kuczkir Parties' Proposed Findings at 30. The case upon which the Kuczkir Parties rely merely states that the

that Kuczkir took steps following Friedman's termination to "cancel" or stall the deal in an explicit attempt to deprive Friedman of his commission under the New Contract. <u>See</u> Exs. 63, 69. Those steps culminated in the creation of a new corporate entity which was substituted for PAK6 and which ultimately entered into the nearly-identical KAP5 Contract. Exs. 28, 29. That Kuczkir went to such lengths to avoid signing the New Contract only to enter into a nearly-identical deal evidences her understanding that Friedman had procured the New Contract and that she would have been obligated to pay him a commission under that contract. Kuczkir's sleight of hand -- switching one corporate entity out for another and delaying the execution of the agreement for a few months -- does not relieve her of that obligation.

9.  The Kuczkir Parties' only defense to the claim of breach of contract is that the entire Commission Agreement is

---

procuring cause doctrine "is generally applied to real estate transactions and almost exclusively to individual transactions where a broker seeks to recover commissions for a single sale." <u>Peter Lampack Agency, Inc. v. Grimes</u>, 939 N.Y.S.2d 409, 410 (App. Div. 2012) (quotation marks omitted). The fact that the procuring cause doctrine is "generally" applied to real estate transactions does not foreclose its applicability in this case. The court in <u>Peter Lampack Agency</u> denied recovery because the plaintiff was not the procuring cause of the contracts at issue. <u>See</u> <u>id.</u> Moreover, it is untrue that the procuring cause doctrine is limited to real estate brokerage contracts. The doctrine was applied in the <u>Manhattan Fuel Company</u> case to a broker who procured two fuel oil supply contracts. 439 F. Supp. at 960, 970.

unenforceable. Specifically, they argue that the Commission Agreement was entered into in violation of New York's Disciplinary Rules and is "therefore void as against the public policy of the state of New York and cannot as a matter of law be ratified." Kuczkir Parties' Proposed Findings at 46.

10. This argument is meritless. The parties agree that the New York Disciplinary Rules governed the provision of both legal and non-legal services provided by Friedman to the Kuczkir Parties during the relevant time period. DR 5-104 governed business relationships between lawyers and their clients and stated, in relevant part:

> A. A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:
>
> 1. The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
>
> 2. The lawyer advises the client to seek the advice of independent counsel in the transaction; and
>
> 3. The client consents in writing, after full disclosure, to the terms of the transaction and to the lawyer's inherent conflict of interest in the transaction.

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.23(A) (2007).

11. "Differing interests" include "every interest that will
    adversely affect either the judgment or the loyalty of a
    lawyer to a client, whether it be a conflicting,
    inconsistent, diverse, or other interest." Id. § 1200.1(1).
    At the time that Friedman approached Kuczkir about entering
    into the Commission Agreement, he had been performing
    literary agency work on her behalf for nearly three years at
    a rate of $325/hour. The two therefore brought "differing
    interests" to the transaction whereby Friedman would go from
    doing literary agency work for an hourly rate of $325/hour to
    performing that same work for the same hourly rate, with the
    addition of an 11% commission. Friedman's interests were in
    being paid as much as Kuczkir would be willing to pay, and
    Kuczkir's interest was in, at the very least, continuing to
    pay the same amount for the same work. Friedman also had an
    interest, not shared by Kuczkir, in continuing to bill hourly
    for all literary agency services rendered so as not to cause
    any financial harm to his law firm, which benefitted from the
    continued hourly billing. The fact that DR 5-104 is not
    implicated when a lawyer negotiates or renegotiates his legal
    fees with a client is irrelevant because the Commission
    Agreement was unrelated to legal work. The negotiation of the
    Commission Agreement was the negotiation of a business

transaction in which the lawyer and the client had different interests. It was therefore subject to the requirements set out in DR 5-104(A), which Friedman did not satisfy. See Tr. 974-75.

12. Friedman therefore violated the Disciplinary Rules by entering into the Commission Agreement without meeting the requirements laid out in DR 5-104 by failing to advise Kuczkir to seek the advice of independent counsel before entering into the Commission Agreement and failing to specify in the Agreement that Kuczkir would continue to be billed $325/hour for the same work that would be subject to the Commission Agreement. Tr. 254; Ex. 11.

13. However, the fact that the Commission Agreement was entered into without the protections required by DR 5-104 does not automatically render the agreement unenforceable or entitle Kuczkir to rescission. Rather, an agreement between an attorney and a client will be voided only if it is tainted by the lawyer's fraud or undue influence or if "it appears that the attorney got the better of the bargain, unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney." Greene v. Greene, 436 N.E.2d 496, 499 (N.Y. 1982); see also Small Bus. Bodyguard Inc. v. House of Moxie, Inc., 230 F. Supp. 3d 290, 321 (S.D.N.Y. 2017) (joint venture

between lawyer and client would not be invalidated where agreement was not fraudulent or unfair and where client entered the agreement with "full knowledge of material facts they needed to enter the contract"). This same standard applies even if there has been a violation of DR 5-104. See Schlanger v. Flaton, 631 N.Y.S.2d 293, 296 (App. Div. 1995).

14. In this case, there was no exploitation of the client's confidence in the attorney. Kuczkir had significant experience dealing with attorneys, including attorneys outside M&S, and had worked with no fewer than five literary agents before Friedman. Tr. 42, 46, 56. Moreover, the agreement was negotiated: Friedman initially proposed a 15% commission, Kuczkir counter-offered at 10%, and the two settled on 11%. Tr. 116-17, 443-44. Kuczkir also consulted with Walter Zacharius before signing the Written Agreement. Tr. 439. And even combined with the hourly rate charged, the 11% commission represented less than the market literary agency rate of 15%. Tr. 43.

15. Friedman took no "affirmative steps to benefit himself at the expense of [his] client" in entering into the Commission Agreement. Schlanger, 631 N.Y.S.2d at 296. Friedman prepared a straightforward agency agreement that was based on the same agreement Kuczkir had had with prior literary agents. Tr. 124; Ex. 11. Friedman continued to owe Kuczkir a fiduciary

duty and was therefore obligated to continue to act in her best interests. Kuczkir maintained complete authority to accept or reject any publishing agreements procured by Friedman, and retained a greater share of the total amount of those contracts -- 89% -- than she had with prior agents. Tr. 55-56, 134. Indeed, if Kuczkir had retained another literary agent, it is likely that she would have paid that agent the market rate of 15% -- 4% more than Friedman charged in commissions -- and there is no evidence that Kuczkir would have obtained better results.

16. The Kuczkir Parties also contend that the Commission Agreement is unenforceable because the total fees -- the combination of the hourly fees and the commissions -- constituted an "illegal or excessive fee" under the Disciplinary Rules. 22 N.Y.C.R.R. § 1200.11(A). "A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." Id. § 1200.11(B).

17. The fee was plainly not excessive. The Kuczkir Parties introduced no evidence that the fee was excessive. Indeed, their expert witness on legal ethics, Professor Roy Simon, testified that he expressed no opinion on whether the fees were excessive because he believed that was a question for

the Court. Tr. 864-66. By the time the Commission Agreement was entered into, Friedman had been performing successfully as Kuczkir's literary agent for three years. Kuczkir has presented no evidence that Friedman performed inadequately as a literary agent. Indeed, Friedman continued to procure lucrative publishing contracts on behalf of the Kuczkir Parties pursuant to the Commission Agreement, under which contracts Kuczkir was paid over $12 million. Kuczkir's Resp. to Friedman 56.1 Stmt. ¶¶ 34-36; see 22 N.Y.C.R.R. § 1200.11(B) (listing considerations relevant to the determination of the reasonableness of a fee). Notably, the total fee arrangement was lower than the "fee customarily charged in the locality for similar [] services," 22 N.Y.C.R.R. § 1200.11(B)(3), because it is well established that the market rate for literary agency services is a commission of 15%. The total fee -- an 11% commission plus hourly billing at a rate of $325/hour, the latter of which totaled approximately $195,000 for literary agency services over more than six years -- was effectively a discount for Kuczkir, who had routinely paid a 15% commission to all of her past agents. Tr. 70.

18. The Kuczkir Parties' defense of unenforceability also fails because the Kuczkir Parties plainly ratified the Commission Agreement and the continued hourly payments by knowingly

operating under that combined fee arrangement for over six years. Beginning in March 2007 and continuing through Friedman's termination on October 1, 2013, the Kuczkir Parties paid Friedman an 11% commission on all contracts negotiated and procured on their behalf while also paying $325/hour for literary agency services rendered. That the literary agency work was being billed hourly was not hidden from the Kuczkir Parties and was plain from the face of the monthly invoices, which Kuczkir herself received, reviewed, and paid on a monthly basis. Tr. 43-44. There is no credible evidence that the Commission Agreement was unconscionable. Despite her protestations to the contrary, Kuczkir was a savvy business person who -- at the time that she negotiated a below-market rate for Friedman's work as a literary agent -- had significant experience dealing with lawyers and literary agents. See In re Lawrence, 23 N.E.3d 965, 976-77, 979 (N.Y. 2014) (concluding that a revised contingency fee agreement between a lawyer and client was not procedurally unconscionable because the fee agreement was "not so difficult for a layperson to comprehend"; the client was actively engaged in the negotiation of the agreement and had experience "hiring and firing attorneys and other professionals"; and because there was no evidence to suggest that the client "was not fully in command of her faculties

when she executed" the agreement; and was not substantively unconscionable particularly in view of the fact that the client was "a competent and shrewd woman who made a business judgment that was reasonable at the time").

19. Moreover, even an unconscionable fee agreement may be ratified when "a fully informed client with equal bargaining power knowingly and voluntarily affirms an existing fee arrangement" and "the client has both a full understanding of the facts that made the agreement voidable and knowledge of his or her rights as a client." <u>King v. Fox</u>, 851 N.E.2d 1184, 1192 (N.Y. 2006). The fee agreement was not rendered unconscionable merely by virtue of having been entered into without the protective steps required under DR 5-104, and as indicated above, the total fee collected was not excessive. Kuczkir personally received, reviewed, and paid the monthly invoices and thereby plainly ratified the Commission Agreement under which she and Friedman performed by operating pursuant to its terms for more than six years. Tr. 42-44, 46, 56, 134. She had full knowledge of the facts and could have terminated the Commission Agreement at any time. But she chose not to do so, instead continuing to accept the benefits of the Agreement. That was ratification.

20. Friedman is therefore entitled to the entirety of the commissions currently being held in escrow, plus statutory prejudgment interest at a rate of 9%. N.Y. C.P.L.R. § 5004.

21. Because Friedman has established his claims for breach of contract, the Court need not address his other claims, which were pleaded in the alternative.

## II. THE KUCZKIR PARTIES' BREACH OF FIDUCIARY DUTY AND MALPRACTICE CLAIMS FAIL

22. "To establish a prima facie case of legal malpractice, the plaintiff must prove that (1) the attorney departed from the exercise of that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, (2) the attorney's departure from the standard of care was the proximate cause of the loss sustained by the plaintiff, and (3) the plaintiff incurred damages as a direct result of the attorney's actions." Edwards v. Haas, Greenstein, Samson, Cohen & Gerstein P.C., 793 N.Y.S.2d 167, 169 (App. Div. 2005). Violation of the Disciplinary Rules, standing alone, does not support a claim of legal malpractice. Schafrann v. N.V. Famka, Inc., 787 N.Y.S.2d 315, 316 (App. Div. 2005). "In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's

43

misconduct." <u>Kurtzman v. Bergstol</u>, 835 N.Y.S.2d 644, 646 (App. Div. 2007).

23. The Kuczkir Parties contend that Friedman committed legal malpractice and breached his fiduciary duty to them by (1) failing to enter into a written retainer agreement with the Kuczkir Parties; (2) charging an excessive fee; and (3) entering into the Commission Agreement without abiding by the protections listed in DR 5-104(A), thereby violating New York public policy as embodied by the Disciplinary Rules. They also contend that M&S committed malpractice by, *inter alia*, failing to execute a written retainer agreement with the Kuczkir Parties and failing to supervise and train lawyers adequately to ensure compliance with the Disciplinary Rules. The Court already dismissed on summary judgment any claim of malpractice related to the absence of a written retainer agreement. And, as explained above, the fee arrangement did not produce excessive fees.

24. The Kuczkir Parties' claims based on the violation of DR 5-104 fail because they have not proved that they suffered any damages. They allege that they were damaged in the amount of the entire sum of fees paid to M&S and Friedman between March 29, 2007 and October 1, 2013. As described above, the Kuczkir Parties knowingly paid those fees for more than six years and therefore ratified the fee arrangement. Moreover, there is no

evidence that the fees were excessive in view of the work that was performed. Those amounts therefore cannot support a claim of damages.

25. Because there is no actionable claim for any underlying violation of the Disciplinary Rules, M&S is not liable for any failure to supervise and train its lawyers.

### CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law. The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, any remaining arguments are either moot or without merit. For the reasons explained above, Friedman is entitled to judgment on Counts One and Two in Action One for breach of contract and is entitled to judgment in the amount of the sum of all monies being held in escrow pending the outcome of this litigation, with 9% interest as calculated pursuant to N.Y. C.P.L.R. § 5001. The remainder of the claims in Action One are **dismissed as moot**. The only remaining counterclaim in Action One is **dismissed with prejudice**. All of the Kuczkir Parties' claims in Action Two are **dismissed with prejudice**.

Friedman shall submit a proposed judgment within five days of the date of this opinion. The remaining parties may submit a counter judgment two days thereafter. Friedman may submit any responses two days after the counter judgments are submitted. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:    New York, New York**
           **August 9, 2017**

__/s/_____

**John G. Koeltl**
**United States District Judge**
